UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------------------------------- x

AMKOR TECHNOLOGY, INC., a Delaware Corporation,

                        Plaintiff/Petitioner,

v.

ALCATEL BUSINESS SYSTEMS, a French Corporation,
ASSURANCES GENERALES DE FRANCE IART, a
French Corporation, and ALCATEL
MICROELECTRONICS N.V., a Belgian corporation.

                        Defendants/Respondents.

Case No. 02-3156

------------------------------------------------------------------------- x

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' ALCATEL BUSINESS SYSTEMS AND ASSURANCES GENERALES DE FRANCE IART MOTION TO DISMISS PURSUANT TO FED R. CIV. P 12(B)(2) AND 12(B)(6)**

**PRELIMINARY STATEMENT**

Defendants ALCATEL BUSINESS SYSTEMS ("ABS") and ASSURANCES GENERALES DE FRANCE IART ("AGF") have moved to dismiss the plaintiff's petition which sought to compel arbitration. As set forth in this Court's December 12, 2002 Order, in response to defendants' motion to dismiss and plaintiff's motion for jurisdictional discovery, the Court granted plaintiff time to conduct jurisdictional discovery as limited to three items of discovery set forth in the paragraph "8" of the Affidavit of plaintiff's counsel, David S. Steuer, dated September 24, 2002. After conducting said discovery, plaintiff, AMKOR TECHNOLOGY, INC. ("AMKOR") now argues that even though defendants ABS and AGF were non-signatories to the Agreement between AME and the AMKOR (hereinafter "the AME/AMKOR Agreement"), ABS and AGF should be bound by the arbitration clause contained therein. AMKOR's two arguments in support of that contention are that: (a) ABS was a direct beneficiary of the agreement and, thus, is bound by its terms; or, in the alternative, (b) ABS was an alter-

97832.1

ego of AME and, thus, can be bound to any contract entered into by AME.  As set forth herein, plaintiff's supplemental brief fails to establish any "direct benefit" that ABS or AGF obtained under the AME/AMKOR Agreement.  Moreover, beyond making the conclusory assertion that ABS and AME are alter-egos, plaintiff has adduced no evidence to support such a claim.  Thus, the plaintiff has failed to establish any basis for this Court to bind ABS and AGF to an arbitration clause in a contract that neither company was aware of until after the litigation ensued.

## STATEMENT OF FACTS

As the Court has already read the original moving papers and heard oral argument on defendants' motion to dismiss, defendants will dispense with a full recitation of the facts in this supplemental submission.

## ARGUMENT

## POINT I

**THE LAW CLEARLY ESTABLISHES THAT ABS AND AGF ARE NOT BOUND BY THE ARBITRATION CLAUSE IN THE AGREEMENT BETWEEN AME AND AMKOR**

Plaintiff does not dispute that ABS and AGF were not signatories to the Agreement.  The law in this Circuit is clear, "there is no dispute that a non-signatory cannot be bound to arbitrate unless it is bound "under traditional principles of contract and agency law" to be akin to a signatory of the underlying agreement."  E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3rd Cir. 2001) (citing Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999)).  More importantly, it is well-established that the "Third Circuit has [] refused to bind non-signatory parties to arbitration agreements, even in cases where the non-signatory controlled or was active in the affairs of the signatory."  District 1199P Service Employees International Union, AFL-CIO CLC v. Rosen, 2002 U.S. Dist. LEXIS 16255 (E.D. Pa. 2002).  Plaintiff, nonetheless, contends that even though ABS had no role in the formation, negotiation or execution of the Agreement

between AME and AMKOR, "ABS, through its conduct and by virtue of its relationship with AME is bound by the Agreement and cannot escape its mandating a Pennsylvania forum." Amkor Supp. Brief,[1] pp. 7-8. In support of its argument, plaintiff relies on three cases from the Third Circuit, and one from the Second Circuit. As detailed below, contrary to plaintiff's assertions, each of these cases actually support the defendants' position that ABS and AGF should not bound by the arbitration clause in the Agreement.

A.      The Cases Cited By The Plaintiff Are Inapplicable To The Facts At Bar

In the first case cited by the plaintiff, E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, (3rd Cir. 2001), the Court held that the non-signatory to the agreement containing the arbitration clause, I.E. DuPont de Nemours and Co. ("DuPont"), was not bound to arbitrate its dispute with one of the signatories. The DuPont case arose from a Joint Venture Agreement between DuPont China ("DPC"), Rhone Poulenc Fiber and Resin Intermediates ("Rhodia Fiber"), and Liaoyang Petro Chemical Fiber Company ("LYPFC"), a Chinese entity. DPC was a subsidiary of DuPont and Rhodia Fiber was a subsidiary of Rhodia, SA ("Rhodia"). Id. at 190-191. After the joint venture failed, DuPont "brought suit against Rhodia Fiber and its parent, Rhodia, to recover, DuPont sa[id], not for breach of the Agreement, to which it was not a party, but rather for breach of an oral agreement and fraudulent misrepresentations which occurred much later in time and as a result of which it was damaged."

Rhodia Fiber and Rhodia moved to dismiss DuPont's complaint and to compel arbitration pursuant to the terms of the Joint Venture Agreement. Id. In affirming the District Court's denial of Rhodia's motion to compel arbitration, the Third Circuit held that the determinative factor as to whether

---

[1] All references to Amkor Technology, Inc's Supplemental Memorandum Regarding Jurisdiction, dated July
(continued . . . )

DuPont had an obligation to arbitrate was the nature of the claims that DuPont had asserted in the complaint it had filed against Rhodia.  "[B]ecause the claims asserted by DuPont do not arise from any "third party beneficiary" status under the [Joint Venture] Agreement, DuPont was not bound to arbitrate its claims as a third party beneficiary."  Id. at 195.  As the Court noted, "DPC is arbitrating the breach of the underlying Agreement and seeking its lost profits and the recoupment of its investment whereas DuPont is litigating its losses arising out of a 1998 oral agreement that was breached and misrepresentations made by appellants' representative outside of the Agreement."  Id. at 197.  The Court further held that the language of the arbitration clause indicated an intent to apply only to the parties to the Joint Venture Agreement.  Id. at 196.  The arbitration clause in the case at bar (much like the clause in the DuPont case), presents the same limiting language.  See Steuer Aff.,[2] Exhibit A, sec. 16.1 – sec. 16.4 (continually referencing the obligations or responsibilities of a Party with respect to arbitration).

The DuPont Court also rejected the equitable estoppel argument advanced by Rhodia as a basis for enforcing the arbitration agreement against a non-party.  Id. at 202.  The DuPont Court noted that generally courts will only bind "non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement."  Id. at 199.  Although DuPont's claim arose "at least in part, from the underlying [Joint Venture] Agreement," the Court found "no evidence that DuPont embraced the [Joint Venture] Agreement itself during the lifetime of the [Joint Venture] Agreement, or that it received any direct benefit under the Agreement."  Id. at 200.  As detailed below, AMKOR has failed to establish that: (a) ABS's or AGF's claims in the French litigation arose from contractual terms contained in the

---

( . . . continued)
18, 2003 are made as "Amkor Supp. Brief".
    [2]    All references to the Affidavit of David S. Steuer in Support of Plaintiff's Response and Motion to Stay Defendants' Motion to Dismiss, sworn to on September 24, 2002 are made as "Steuer Aff."

AME/AMKOR Agreement; (b) ABS or AGF "embraced" the AME/AMKOR Agreement; or that (c) ABS or AGF received any "direct benefit" under the terms of the AME/AMKOR Agreement. Accordingly, the DuPont case proves exactly why ABS should not be compelled to arbitrate the claims currently pending in the French tort litigation.

The second case relied upon by the plaintiff, Technetronics, Inc. v. Leybold-Graeus GmbH, 1993 WL 197028 (E.D.Pa., June 9, 1993), is easily distinguishable from the case at bar. In Technetronics, the defendant, Leybold entered into a contract with Rokoma B.V. ("Rokoma") to sell industrial equipment used in the production of CDs. Id. at *1. Rokoma also entered into separate contract with the plaintiff, Technetronics, wherein Rokoma agreed to act as a "liaison" between various manufacturers. Id. The Rokoma-Leybold contract provided that Leybold would transfer all of its rights and obligations to Technetronics upon a demand from Technetronics to do so. Id. Technetronics exercised this demand and informed Leybold of its actions. Thus, there was no dispute that Technetronics assumed the rights and obligations of Rokoma under the Rokoma-Leybold contract. Leybold later terminated the agreement.

Several years later, Technetronics commenced a lawsuit against Leybold seeking return of Leybold's original 1 million DM (Deutschmarks) deposit. Leybold moved to dismiss the claim (and to compel arbitration) seeking to invoke an arbitration clause that appeared in the original Rokoma-Leybold contract. Id. at *2. The Court granted the motion to dismiss, holding that although Technectronics was a non-signatory to the arbitration agreement, it was bound by the arbitration clause because it "accepted all of Rokoma's rights and responsibilities under the original contract [including the arbitration clause]." Id. at *5. The Technetronics Court focused on the fact that Technetronics was seeking to recover the security deposit paid by Rokoma under the original contract but was then attempting to argue that it was not bound under the arbitration clause in the same contract. Id. at *5.

- 5 -

97832.1

As noted above and in the original moving papers, there was no assumption of AME's rights and obligations under the AME/AMKOR Agreement nor are the claims asserted by ABS in the French litigation based upon contractual obligations of AME in the Agreement. Accordingly, the Technetronics case, is clearly inapplicable to the facts at bar.

Plaintiff also cites to International Paper Company v. Schwabedissen Maschinen & Anlagen GmbH, 206 F.3d 411 (4th Cir. 2000) in further support of its equitable estoppel argument. Plaintiff does not detail any of the facts of the International Paper case because they are clearly not applicable to the facts at bar. International Paper sought to purchase a custom saw from a German manufacturer, Schwabedissen. Id. at 414. The transaction was conducted through Schwabedissen's U.S. distributor, Wood Systems. International Paper sent a purchase order to Wood who, in turn, relayed the order to Schwabedissen. Id. Before the order was finalized, International Paper actually visited the manufacturing facilities to observe the production process. There was no written contract between International Paper and Schwabedissen. After the saw failed to work, International Paper commenced suit against Schwabedissen seeking to enforce the guarantees and warranties contained exclusively in the Wood-Schwabedissen contract (the same contract containing the arbitration clause). Id. at 413-14. The Fourth Circuit specifically held that the Wood-Schwabedissen contract containing the arbitration clause "provide[d] part of the factual foundation for every claim asserted by International Paper [the non-signatory] against Schwabedissen [the signatory to the contract]" and that because "International Paper's entire case hinges on its asserted rights under the Wood-Schwabedissen contract it cannot seek to enforce those contractual rights and avoid the contract's requirement that "any dispute arising out of" of the contract be arbitrated." Id. at 418.

The International Paper case, like the other cases cited by the plaintiff, is distinguishable from the facts at bar when one looks at the critical issues – what was the basis of the lawsuit brought by the

97832.1

non-signatory (International Paper) against the signatory (Schwabedissen).  As detailed above, the lawsuit by International Paper clearly arose directly out of the provisions in the Wood-Schwabedissen contract (which also contained the arbitration clause).  Under those limited circumstances the Court ordered the non-signatory to abide by an arbitration clause in the contract.  In the case at bar, however, there is no evidence that ABS ever visited the AMKOR facilities prior to the execution of the Agreement.  In fact, the undisputed testimony is that ABS did not even learn of the AME/AMKOR Agreement until after the problems with the litigation ensued.  More importantly, the French litigation commenced by ABS and AGF does not rely on the contractual provisions of the AME/AMKOR Agreement.  Accordingly, the International Paper case is inapplicable.

Plaintiff also relies upon the Second Circuit's decision in American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2d Cir. 1999).  In the Tencara case, several investors (the "Owners") entered into a construction contract with Tencara, an Italian shipyard-to build a racing yacht that would eventually be named the "Tag Heuer."  The construction contract between Tencara and the Owners specified that (1) the Owners would be solely responsible for registering the vessel under the French flag, (2) the Owners would provide all necessary assistance to Tencara to ensure that the yacht met with the approval of the French authorities, and (3) the ship would be "classed" according "[t]o the quality standards and norms permitting approval of ... the American Bureau of Shipping, Genoa Office." Id. at 351.  Tencara contracted with the American Bureau of Shipping to obtain the classification for the Tag Heuer and provided a copy of the contract a few months thereafter.  Id.  As the Second Circuit noted, the "classification" of the ship was a critical aspect of the contract as the resulting certification "are required either legally or practically before a shipowner may ply navigable waters." Id. at 351. Moreover, "[v]essel classification provides two major benefits for shipowners.  First, insurance is much less expensive for classed ships than for non-classed ships.  Second . . .the French authorities in this case

97832.1

require a vessel classification before they will allow a craft to sail under their national flag." Id. Moreover, the insurance coverage obtained on the Tag Heuer "was premised on the existence of a valid classification." Id.

In the Tencara case, the Second Circuit held that the Owners were bound to an arbitration clause in a contract between Tencara and the American Bureau of Shipping under an estoppel theory. The Court held that the Owners received several direct benefits as a result of the certification issued by ABS including significantly lower insurance rates on the Tag Heuer, and the ability to sail under the French flag and, thus, it was required to arbitrate the claims it had against the American Bureau of Shipping. Id. at 353. As set forth below, ABS did not receive any direct benefits as a result of the AME/AMKOR Agreement and the inter-relationship between the parties involved in the Tencara case is simply non-existent in the case at bar.

**B.     The Depositions of the ABS Employees Confirm That Plaintiff Has Failed To Meet The Threshold For Binding A Non-Signatory To An Arbitration Clause On Equitable Estoppel Grounds**

Despite plaintiff's protestations otherwise, neither ABS nor AGF "embraced" the Agreement between AME and AMKOR or received any "direct benefit" under the Agreement. The testimony elicited from the three ABS employees that plaintiff selected for depositions on jurisdictional discovery, Dominique Castel, Herve Karabadajakian, and Sylvie Lallement, confirms that ABS did not "embrace" or receive any "direct benefit" from the Agreement between AME and AMKOR. Complete copies of

their deposition transcripts are annexed to the accompanying Declaration of Thomas A. Leghorn, as exhibits A, B, and C, respectively.[3]

All of the ABS employees confirmed that they had either never seen the Agreement or only came to learn of its existence after the problems with chips developed and litigation ensued. Karabadajakian Tr., p. 12; Castel Tr., pp. 29-30; Lallement Tr., pp. 13, 15. Thus, ABS did not "embrace" the Agreement. Moreover, ABS was not a "direct" beneficiary of the AME/AMKOR Agreement. The jurisdictional depositions confirmed that AME was actually only a secondary supplier of the "BBGX" chip that is at issue in this case. Castel Tr., p. 14. In fact, ABS had contracted with another company, ST Microelectronics ("ST Micro"), as the primary supplier of both analog and digital chips, including the "BBGX" chip. Castel Tr., pp. 17, 18. Thus, if ABS was purchasing the chip from ST Micro directly, the claim that ABS was using AME as merely a purchasing agent for the BBGX chip has no merit. Moreover, AME used at least two other chip suppliers, UMC and TSMC, to manufacture the "BBGX" chip. Castel Tr., p. 20. This is further evidence that ABS simply purchased the chips from AME, who had, in turn, engaged multiple entities to provide the necessary components. Mr. Castel further confirmed that ABS had no communication with AMKOR regarding the development of the chip. Castel Tr., p. 21. Thus, the testimonial evidence confirmed that ABS did not set out any restrictions as to the subcontractors that AME and/or ST Micro could use to manufacture any of the components at issue. Without the element of control or involvement in the negotiation and/or manufacturing process between AME and AMKOR, there can be no claim of a direct benefit that flowed to ABS as a result of the AME/AMKOR Agreement.

---

[3] The excerpts of the transcripts of the ABS employees submitted with the Declaration of Ignacio E. Salceda in support of the plaintiff's supplemental submission are incomplete and fail to include the relevant testimony from each witness confirming the lack of any basis for imposing estoppel and or alter-ego liability.

- 9 -

97832.1

Plaintiff's "direct benefit" theory -- that ABS worked with AME in developing the chip and, thus ABS has a contractual relationship with every supplier that AME used in the production -- is simply belied by the existing case law. Amkor Supp. Brief, p. 9. Plaintiff's assertions of ABS' alleged control over the "process which led to the semiconductor products being manufactured by Amkor" fails to rise to the level of making ABS a "direct" beneficiary of the Agreement between AME and AMKOR. Amkor Supp. Brief., p. 10. See DuPont, supra. Moreover, as detailed in the original moving papers, the claims asserted by ABS against AMKOR in the French litigation do not arise out of the AME/AMKOR Agreement, rather they seek relief on two non-contractual grounds: (1) tort liability under Articles 1382 ff. of the Civil Code; and a (2) latent defect claim under Articles 1641 ff. of the Civil Code. See Scher Aff., Exhibit C.

Accordingly, this Court should not force ABS to arbitrate its pending claims against AMKOR because: (a) the claims in the French litigation do not arise out of the AME/AMKOR Agreement; (b) ABS never "embraced" the terms of the AME/AMKOR Agreement, in fact, it did not even learn of the Agreement until after the problems with the chips were discovered; and (c) ABS did not receive any direct benefits under the AME/AMKOR Agreement.

**C.  Plaintiff Has Failed To Establish Any Basis for Imposing Alter Ego Liability**

Plaintiff craftily asserts its second contention for binding ABS and AGF to the arbitration clause – that ABS and AME were alter-egos and, as such, ABS should be bound to any contract that AME executed with third parties (in this case, AMKOR). Plaintiff broadly cites several cases for the general proposition that a non-signatory can be bound to an arbitration clause entered into by its alter-ego. Amkor Supp. Brief, p. 11. Plaintiff, however, never discusses the standard in this Circuit for establishing alter-ego liability. The Third Circuit has specifically held that "[b]ecause alter ego is akin to and has elements of fraud, we think it too must be shown by clear and convincing evidence." Kaplan

- 10 -
97832.1

v. First Options of Chicago, Inc., 19 F.3d 1503, 1522 (3rd Cir. 1994).  Incredibly, plaintiff cites this case as purportedly supporting its attempt to create alter ego liability for ABS.  In Kaplan, the Court actually ruled that it had insufficient grounds to find alter-ego liability despite finding specific acts of potential commingling of funds.  Thus, there is clearly a very high threshold in this Circuit before a Court is empowered to impose alter-ego liability.

AMKOR does not dispute that ABS and AME were two separate and distinct subsidiaries of Alcatel, NA maintaining all corporate formalities.  Plaintiff does not dispute that that there was no commingling of funds or an overlapping board of directors between the two companies.  See e.g. Lallement Tr., pp. 33-40.  Rather, plaintiff attempts to create alter-ego liability by mischaracterizing the testimony provided by the ABS employees.  A review of the "facts" postulated by the plaintiff in support of its alter-ego argument confirm that none of the elements for establishing alter-ego liability have been met.  Plaintiff's alter ego claim is based primarily on three factors: (a) that ABS and AME employees were generally located in the same campus of buildings; (b) that ABS only used purchase orders when it ordered products from AME rather than formal contracts; and (c) ABS did not have an agreement that dealt with hypothetical intellectual property issues.  Amkor Supp. Brief, pp. 10-11.

All of these claims by the plaintiff, even if taken as true, do not rise to the level required to prove alter-ego liability.  First, the fact that ABS and AME employees were, at one time, located in the same office campus is hardly sufficient to establish alter-ego liability.  Plaintiff readily concedes this fact. Second, plaintiff argues that the use of purchase orders by ABS is evidence of alter ego liability. Plaintiff offers no case law to support this contention.  Moreover, plaintiff's submission takes the testimony of Ms. Lallement regarding ABS' use of purchase orders with respect to orders from AME out of context.  Ms. Lallement actually testified that ABS often times use purchase orders, not formal contracts, with many of its suppliers, including, but in no way limited to AME.  Lallement Tr., p. 25.

- 11 -

97832.1

This is surely the business practice of thousands of companies throughout the world – the purchaser issues a purchase order and in return, the seller issues an invoice.  How plaintiff believes this supports a claim of alter ego liability is hard to fathom.  Finally, plaintiff's "inquiry" as to why there was no agreement as to hypothetical intellectual property issues can hardly be sufficient to create alter ego liability.  There is no evidence in this case of any intellectual property issues and purported lack of an agreement between AME and ABS as to this theoretical issue is, once again, insufficient to meet the stringent threshold imposed by this Circuit to impose alter ego liability.  See Kaplan, supra.

**POINT II**

**THE PLAINTIFF HAS FAILED TO ESTABLISH ANY GROUNDS FOR THIS COURT TO ADHERE TO THE PRINCIPLES OF INTERNATIONAL COMITY**

As set forth in the original moving papers, the Petition by AMKOR not only seeks to compel arbitration in Philadelphia but it also seeks an injunction precluding ABS and AGF from proceeding with an action that has been pending in France since March, 2002.  In further support of adhering to international comity is the fact that AMKOR apparently only filed this action after it received an unfavorable order from the Paris Commercial Court, dated April 12, 2002, regarding AMKOR's argument that the French Court lacked jurisdiction over AMKOR.  See Joint Submission, Exhibit A1/A2.[4]  As set forth in the original moving papers, AMKOR's Petition in this matter raises the exact same arguments (i.e., invocation of the arbitration clause and lack of jurisdiction of the French courts) that it has already argued to the French Commercial Court.

---

[4] All references to the Joint Submission of Orders Issued by French Tribunals With English Translations in Response to Court's May 22, 2003 Order are made as "Joint Submission".

97832.1

Defendants will not reiterate the principles of international comity set forth in the original moving papers except to emphasize that the Third Circuit has adopted a "restrictive approach" to issuing antisuit injunctions which "rarely permits injunctions against foreign proceedings." General Elec. Co. v. Deutz AG, 270 F.3d at 160-161.  Under the restrictive approach, foreign parallel proceedings are only enjoined "to protect jurisdiction or an important public policy."  Id.  Neither of those grounds are implicated in the case at bar as both issues have been addressed by the French courts.

Plaintiff contends that comity should not be applied because the "[t]he French decision cited by Defendants is an interlocutory ruling solely on French law by a judge of the Paris Commercial Court, that is not definitive and does not bind this Court."  Amkor Supp. Brief, p. 3.  Thus, under plaintiff's logic, until a case is finally adjudicated in foreign country, it is not entitled to comity.  The principles of international comity to not dictate such an edict.  Moreover, during the pendency of the defendants' motion to dismiss in this action and the jurisdictional discovery over the past several months, the French appellate courts have affirmed the decision of the Judge in the French Commercial Court.  Joint Submission, Exhibit C1/C2.  Thus, as previously argued, the principles of international comity warrant dismissal of the Petition filed by the plaintiff.

## POINT III

### IN THE ALTERNATIVE, THIS CASE SHOULD BE DISMISSED ON FORUM NON CONVENIENS GROUNDS

Defendants respectfully refer the Court to their original submission with respect to the application for the dismissal of this matter on forum *non conveniens* grounds.  Defendants merely add to those facts that ABS and AGF are both French corporations.  At no time has plaintiff alleged that any of its own employees with knowledge of the facts of the case are located in Pennsylvania.  Plaintif has done no more than to merely assert that its headquarters are located within this State.  Moreover, the

recent depositions also confirmed that the facility used by the plaintiff to manufacture the chips at issue is in South Korea, not Pennsylvania. Accordingly, there are now additional grounds to dismiss this case for forum *non coveniens*. Karabadjakian Tr., pp. 14-15.

## **CONCLUSION**

WHEREFORE, it is respectfully requested that this Court enter an Order dismissing the Petition filed by AMKOR TECHNOLOGY, INC., a Delaware Corporation (hereinafter "AMKOR") pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted or, in the alternative, dismiss the case on *forum non conveniens* grounds.

Dated: August 4, 2003

        Respectfully submitted,

        WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

        By: _____
            Louis J. Isaacsohn, Esquire
            Wendy D. Testa, Esquire
            Attorneys for Defendants
            ALCATEL BUSINESS SYSTEMS and
            ASSURANCES GENERALES DE FRANCE
            IART
            Independence Square West
            The Curtis Center, Suite 1130 East
            Philadelphia, PA 19106-3308
            (215) 627-6900

Of Counsel:

Thomas A. Leghorn (admitted *pro hac vice*)
Brett A. Scher (admitted *pro hac vice*)
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
150 East 42nd Street
New York, New York 10017
(212) 490-3000

97832.1