# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMKOR TECHNOLOGY, INC., a
Delaware Corporation,

        Plaintiff

    v.

ALCATEL BUSINESS SYSTEMS, a
French Corporation, ASSURANCES
GENERALES DE FRANCE IART, a
French Corporation, and ALCATEL
MICROELECTRONICS N.V., a Belgian
Corporation,

        Defendants

CIVIL ACTION

No. 02-3156

# OPINION

August 22, 2003

      This case represents the domestic half of a dispute unfolding on parallel litigation tracks — one set in a Paris Commercial Court and one in this court.  At the root of both actions are the tort claims brought against plaintiff Amkor Technology, Inc. ("Amkor") in France by two of the parties captioned as defendants in the instant action — Alcatel Business Systems ("ABS") and Assurances Generales de France Iart ("AGF").  Amkor seeks in the lawsuit pending in this court to obtain (1) an order compelling ABS, AGF, and Alcatel Microelectronics N.V. ("AME") to submit to arbitration and (2) a declaratory judgment prohibiting the three defendants from further prosecuting their claims in the French lawsuit.

On November 5, 1999, Amkor entered into an agreement with AME that called for Amkor to sell mobile telephone components to AME. Article 16 of the agreement provides for arbitration of disputes, including claims "based on contract, tort, or statute." The agreement contemplates that arbitration would occur in Philadelphia, Pennsylvania and be governed by Pennsylvania law. ABS and AGF were not signatories to the agreement.

In accordance with the agreement, Amkor delivered components to AME, which in turn sold the mobile telephones containing the components to ABS, the entity that marketed the telephones. Problems arose with the telephones' operation, and ABS claimed that the components provided by Amkor were defective, in that they were prone to failure when used in high-temperature, high-humidity environments. In March 2002, ABS and its insurer, AGF, brought two actions in the Paris Commercial Court pursuant to French Civil Code provisions regarding tort liability and latent defects. AME is not a party to either lawsuit, both of which are still pending.

In May of 2002, Amkor filed the lawsuit in this court to enforce the arbitration clause in its agreement with AME. ABS and AGF then filed the motion now before this court to dismiss for lack of personal jurisdiction pursuant to FRCP 12(b)(2) and for failure to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6). In the alternative, ABS and AGF seek dismissal based on forum non conveniens.

In response to the defendants' submission, Amkor moved this court to stay consideration of the motion to dismiss pending jurisdictional discovery. On December 11, 2002, I held a hearing on the parties' motions. I granted Amkor's motion for a stay and so deferred ruling on the motion to dismiss until Amkor had the benefit of jurisdictional discovery to attempt to

establish this court's personal jurisdiction over ABS and AGF resulting from ABS's relationship with AME and/or ABS's benefit from the contract between Amkor and AME. The jurisdictional discovery has now been completed, and the motion to dismiss is now ripe for decision.

**Personal jurisdiction**

Under Federal Rule of Civil Procedure 4(e), a district court may assert personal jurisdiction over non-resident defendants to the extent permissible under the law of the forum state. Pennsylvania's long-arm statute, 42 Pa.C.S. § 5322(b), permits the exercise of personal jurisdiction to the full extent allowed by the Fourteenth Amendment's Due Process Clause.

ABS and AGF insist that they have no contacts with the state of Pennsylvania sufficient to give rise to personal jurisdiction, and, moreover, that they were not parties to the agreement between AME and Amkor that contained the arbitration clause. ABS is not a corporate "alter ego" of AME, the ABS's Chief Operating Officer avers in an affidavit filed with ABS's motion. The defendants observe that while both ABS and AME were at one time subsidiaries of a common parent, Alcatel S.A., AME has been subsequently acquired by ST Microelectronics, a company headquartered in Switzerland and apparently unrelated to Alcatel S.A. That change of ownership is of little moment to the instant case, as it occurred after the commencement of this litigation.

To establish personal jurisdiction over the defendants, Amkor focuses on the arbitration agreement and argues that ABS is included in the agreement's ambit. It follows, Amkor argues, that ABS has submitted to the jurisdiction of this court by virtue of the contract from which ABS derived benefit.

While, of course, a non-signatory normally cannot be bound to an arbitration agreement,

courts have established five theories justifying an exception to the general rule: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.  *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (cited favorably in *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001)).  For the purposes of this case, the fifth theory — estoppel — is of primary interest.

At least through October of 2001, the Third Circuit had not applied equitable estoppel to bind a non-signatory to an arbitration clause.  *DuPont*, 269 F.3d at 199 (opinion dated October 15, 2001).[1]  Judge Barry, in making that observation on behalf of herself and Judges Scirica and Alito, was quick to add, however, that "there appears to be no reason why, in an appropriate case, we would refrain from doing so."  *Id.*  As explained by the *DuPont* court, non-signatories may be obligated to arbitrate disputes when they knowingly exploit an agreement containing an arbitration clause, despite never having signed the agreement.[2]  *Id.*  The principle underlying the

---

[1]In *DuPont*, the Third Circuit held that there was no evidence of the non-signatory embracing the contract or receiving a direct benefit therefrom, and so did not apply equitable estoppel.  269 F.3d at 200.  There had been no proof that DuPont was "positioned to derive more than shareholder benefits" through a subsidiary that was a signatory to a contract containing the arbitration clause.  *Id.* at 197.

[2]The *DuPont* court also recognized a second theory of collateral estoppel:

[C]ourts have bound a signatory to arbitrate with a non-signatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.

269 F.3d at 199 (internal citations and quotation marks omitted).  This second theory is not relevant to the situation before this court, in which a signatory — Amkor — seeks to bind non-signatories — ABS and AGF — to an arbitration agreement.  Rather, the second estoppel

-4-

theory is that a non-signatory should not be permitted to embrace a contract for some purposes and then disclaim that same contract's unfavorable terms.  *Id.* at 200.  To prevail on this theory, the party seeking to enforce the arbitration clause must show that the non-signatory to be bound received a "direct benefit" from the contract containing the clause.  *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 350 (2d Cir. 1999); *DuPont*, 269 F.3d at 200 (citing *Tencara* favorably).

In *Tencara*, a group of investors had entered into a construction contract pursuant to which the other party to the contract — Tencara, an Italian shipyard — would build a ship that would meet the approval of the American Bureau of Shipping's Genoa office ("ABSG"). Tencara subsequently entered into a separate contract with ABSG to obtain ABSG's classification (*i.e.*, inspection and approval) of the ship.   That ABSG contract — a contract to which the ship purchasers were not a party — contained an arbitration clause.  Eventually, ABSG provided to Tencara an Interim Certificate of Classification ("ICC"), which explicitly incorporated the terms of the ABSG contract, including the arbitration clause.  Tencara, which had "handled virtually all matters related to shipbuilding and classification," then passed the ICC on to the ship buyers along with the completed ship.  170 F.3d at 351.  A few months later, the ship built by Tencara suffered serious hull damage due to defective design and poor construction, and the ship purchasers filed claims against ABSG in France.  ABSG then brought an action in a United States federal court seeking to compel the non-signatory ship purchasers to arbitrate their claim pursuant to the ABSG contract.

---

theory would apply only in the obverse situation, in which a non-signatory seeks to compel a signatory to arbitrate.  *Id.* at 202.

Judge Calabresi, writing for a unanimous panel, explained that "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Id.* at 353. The court then found that the ship purchasers had derived a direct benefit from the ICC in the form of significantly lower insurance rates on the ship and the ability to sail under the French flag. *Id.* As a result, the ship purchasers were required to arbitrate their claims against ABSG. Further, the ship purchasers' insurer was also compelled to submit to arbitration, as "[i]t is clearly established that 'an insurer-subrogee stands in the shoes of its insured.'" *Id.* at 353 (quoting *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 106 (2d Cir. 1992)).

Amkor maintains that "a party that accepts the benefit of a contract incorporating an arbitration clause — as ABS accepted the benefit of Amkor's custom chip manufacturing — must also accept the burden of the arbitration clause as a matter of estoppel." In support of this argument, Amkor points to a litany of facts elicited during discovery:

(1)    ABS jointly designed the semiconductors at issue with AME;
(2)    ABS knew that AME, which was unable to manufacture digital (as opposed to analog) semiconductors, would have to have another supplier manufacture the semiconductors;
(3)    ABS reviewed and approved the final design of the semiconductors before the design was sent to Amkor;
(4)    ABS tested prototypes of the semiconductors after they had been manufactured by Amkor;
(5)    AME could not alter the specifications of the semiconductors without ABS's approval;
(6)    the people working on the project for ABS and AME were physically located in the same campus of buildings;
(7)    ABS does not have a single contract concerning the product (or apparently anything else despite the fact that AME supplied other products);
(8)    AME performed the same design and engineering services for ABS (designing what is called the "back end" of the chip since 1994);
(9)    ABS did not have any agreements with AME concerning the ownership of

-6-

the intellectual property that they jointly created so as to design the semiconductors, this despite the fact that ABS has a policy of entering into such agreements when it deals with third parties;

(10)    AME could modify the layout of the semiconductors, but not the specifications, without ABS's approval, but this authority was not documented in any way;

(11)    ABS stopped using AME as a supplier as soon as AME was sold to another company.

AME and ABS, at all relevant times sister companies, each apparently played a fairly significant role in the process of designing, purchasing, utilizing, and selling the Amkor chips. Just as the ship purchasers in *Tencara* received a "direct benefit" from the ICC provided by ABS to the Tencara shipyard, so too did ABS receive the direct benefit of having custom-made Amkor chips made available through AME's contract. At all relevant times, ABS knew that AME would ultimately contract with a third-party supplier to obtain the chips designed and requested by ABS — and that ABS would receive the benefit of the custom chips that the third party supplied. To permit ABS to avoid the operation of the arbitration clause by obtaining Amkor's chips through a mesne transaction involving a closely related sister company would yield an inequitable result in this case.

ABS and AGF contend that "[w]ithout the element of control or involvement in the negotiation and/or manufacturing process between AME and AMKOR, there can be no claim of a direct benefit that flowed to ABS as a result of the AME/AMKOR agreement." Even if one assumes *arguendo* that ABS did not inject itself into the communications between Amkor and AME, the *Tencara* case shows that, so long as a non-signatory has received a direct benefit from a contract, it is not essential that the non-signatory be shown to have interacted regularly with the signatory that seeks to enforce an arbitration clause. In *Tencara*, the court observed that the ship

purchasers (the non-signatories analogous to ABS) "had only limited contact with [ABSG, the

signatory analogous to Amkor], and Tencara [the signatory analogous to AME] handled virtually

all matters related to shipbuilding and classification."  170 F.3d at 351.  Therefore, ABS's

insistence that it had insubstantial direct contact with Amkor carries little force in suggesting a

result different from that reached in *Tencara*.[3]

      In sum, I find that direct benefits from the Amkor/AME agreement accrued to ABS.  ABS

is bound to the arbitration clause to which AME agreed.  So, too, the arbitration clause binds

AGF, which, as ABS's insurer, stands in the shoes of its client.[4]

      Because I find that principles of estoppel prevent ABS and AGF from avoiding the effect

of the arbitration clause, it follows that this court has personal jurisdiction over those two

companies.  As explained by the *Tencara* court:

> The [ship purchasers argue] that personal jurisdiction exists only when there is an
> express arbitration agreement between the parties. But if the [ship purchasers] are
> estopped from denying their obligations under the arbitration agreement between
> Tencara and ABS, it follows that they are also estopped from asserting a lack of
> personal jurisdiction based on that agreement.  There is no good reason to read the
> equitable theory of estoppel to allow the defense of "no personal jurisdiction"
> while barring the defense of "no duty to arbitrate."  With the owners estopped
> from denying personal jurisdiction, the law regards such jurisdiction as
> established in litigation between these parties.

---

[3]ABS and AGF argue also that the "non-contractual" French claims — alleging tort
liability and latent defect — fall outside the scope of disputes that AME agreed to arbitrate.  The
sweeping language of the arbitration clause, which expressly embraces tort claims, convinces me
otherwise:

> Any controversy, dispute or claim arising out of, in connection with, or in
> relation to the interpretation, performance or breach of this Agreement, including
> any claim based on contract, tort or statute, shall be settled . . . by arbitration . . . .

[4]ABS and AGF also seek dismissal based upon forum non conveniens.  Because ABS and
AGF, as I today find, are bound to the contract that AME entered, they will not be heard to argue
that the dispute-resolution forum specified in that contract is inconvenient to them.

*Tencara*, 170 F.3d at 352.

**Failure to state a claim upon which relief can be granted**

ABS and AGF, in addition to the personal-jurisdiction issue, have raised in their motion

to dismiss the principle of "international comity."  Essentially, ABS and AGF suggest that the

relief Amkor seeks — an injunction against continued proceedings in the French court — would

violate the Third Circuit's precedent, which adopts a "restrictive approach" and "rarely permits"

the issuance of anti-suit injunctions.  *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 160-61 (3rd Cir.

2001); *see also Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877, 887 (3rd

Cir. 1981).  Therefore, the argument goes, the relief sought by Amkor would be inappropriate

and so Amkor has failed to state a claim upon which relief can be granted.  Bolstering ABS and

AGF's argument about international comity is the fact that Amkor has already taken pains to alert

the French court to the existence of the arbitration clause; the French trial court has thus far

permitted proceedings there to continue despite acknowledging the existence of the arbitration

clause.  In addition, a French appellate tribunal has affirmed the decision to maintain French

jurisdiction:

> [W]hile the contract concluded on November 5, 1999 between Amkor and
> AME provides for the application of the law of the State of Pennsylvania and an
> AAA arbitration clause (with the American Arbitration Association) in
> Pennsylvania, nevertheless the first judge rightly upheld his jurisdiction on the
> grounds that the existence of an arbitration clause — which ABS does not deny
> being aware of — does not preclude a request for an expert appraisal before the
> summary jurisdiction, and that it declared it had jurisdiction noting that the
> disputed products were distributed in Paris . . . .

Joint Submission of Orders Issued by French Tribunals with English Translations,
Appendix C(2), p.5.

As a general matter, domestic and foreign proceedings may proceed in parallel regarding

similar matters.  *See Deutz*, 270 F.3d at 157 ("[P]arallel proceedings are ordinarily permitted to proceed simultaneously, at least until one has reached the stage where its ruling becomes *res judicata*."); *Bauxites*, 651 F.2d at 887 (noting that actions in domestic and foreign courts may proceed concurrently at least until judgment is obtained in one of the fora).

The Third Circuit has described the judicial reluctance to enjoin foreign proceedings as follows:

> The primary reason for giving effect to the rulings of foreign tribunals is that such recognition factors international cooperation and encourages reciprocity.  Thus, comity promotes predictability and stability in legal expectations, two critical components of successful international commercial enterprises.  It also encourages the rule of law, which is especially important because as trade expands across international borders, the necessity for cooperation among nations increases as well.

> The Supreme Court has taken to task American courts that have demonstrated unduly narrow attitudes in this area:

>> "The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. . . .  We cannot have trade and commerce in world markets and international waters on our terms, governed by our laws, and resolved in our courts."

> *THE BREMEN v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972).

> In another case emphasizing world economic interdependence, the Court of Appeals for the Sixth Circuit noted that the proper exercise of comity demonstrates confidence in the foreign court's ability to adjudicate a dispute fairly and efficiently.  *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir. 1992).  Failure to accord such deference invites similar disrespect for our judicial proceedings.  Reciprocity and cooperation are worthy goals of comity.  *Id.*

> The federal Courts of Appeals have not established a uniform rule for determining when injunctions on foreign litigation are justified.  Two standards, it appears, have developed.  Courts following the "liberal" or "lax" standard will issue an injunction where policy in the enjoining forum is frustrated, the foreign

proceeding would be vexatious or would threaten a domestic court's *in rem* or *quasi in rem* jurisdiction or other equitable considerations, and finally, where allowing the foreign proceedings to continue would result in delay. The Courts of Appeals for the Fifth, Seventh, and Ninth Circuits generally apply this standard.

By contrast, the Second, Sixth and District of Columbia Circuits use a more restrictive approach, rarely permitting injunctions against foreign proceedings. These courts approve enjoining foreign parallel proceedings only to protect jurisdiction or an important public policy. Vexatiousness and inconvenience to the parties carry far less weight.

Our court is among those that resort to the more restrictive standard.

*Deutz*, 270 F.3d at 160-61 (footnotes omitted).

As the *Deutz* court noted, on rare occasions when jurisdiction or crucial public policy is at risk, foreign proceedings may be enjoined. However, the courts adopting the restrictive approach have interpreted these exceptions narrowly. *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 127 (3d Cir. 2002); *see, e.g.*, *Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 915 (D.C. Cir. 1984) (approving anti-suit injunction when foreign defendants initiated the foreign proceeding for the "sole purpose of terminating the United States claim" and where the foreign court had enjoined United States litigation).

While enjoining foreign proceedings is a rarity, courts do occasionally take such action, and so it cannot be said that Amkor has failed to state a claim upon which relief can be granted. Further, it is important to note that Amkor also seeks to compel arbitration in this case and a declaratory judgment that ABS and AGF are bound to the arbitration clause. Because foreign and United States proceedings may proceed in parallel, there appear to be no significant impediments to granting Amkor's alternative claims for relief. The motion to dismiss will be denied with the accompanying order.

-11-

**Merits of Amkor's case**

As a technical matter, the instant motion is a preliminary one — it seeks dismissal due to lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. The defendants have yet to answer the plaintiff's complaint.  Still, from a pragmatic standpoint, the merits of the case were necessarily a part of the parties' briefing and the court's consideration of the motion to dismiss, and this opinion therefore includes a good deal of discussion that relates to the substance of the parties' dispute.

At this point in the litigation, I will do no more than deny the defendants' motion to dismiss.  Based on the submissions thus far, I am inclined to compel ABS and AGF to arbitrate their dispute with Amkor pursuant to the arbitration clause to which AME committed itself — thus engendering parallel proceedings in France and the United States.  However, I will refrain from entering an order to that effect until the defendants have had an opportunity to answer Amkor's complaint and the parties have filed submissions regarding the proper procedure to be followed to resolve the substantive claims in this case.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMKOR TECHNOLOGY, INC., a
Delaware Corporation,

               Plaintiff

    v.

ALCATEL BUSINESS SYSTEMS, a
French Corporation, ASSURANCES
GENERALES DE FRANCE IART, a
French Corporation, and ALCATEL
MICROELECTRONICS N.V., a Belgian
Corporation,

               Defendants

CIVIL ACTION

No. 02-3156

## ORDER

August 22, 2003

      For the reasons given in the accompanying opinion, it is hereby ORDERED that:

(1)    The Motion to Dismiss Defendants Alcatel Business Systems and Assurances Generales de France Iart Pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6) or in the Alternative Forum Non Conveniens (Docket # 5) is DENIED.

(2)    Within 10 days of the date of this order, the defendants shall submit to this court, with a copy to the plaintiff, their answer to the plaintiff's complaint.

(3)    Within 30 days of the date of this order, all parties shall file with this court, with a copy to the opposing parties, submissions discussing the proper resolution of this case in light of today's opinion.

                                       _____

                                       Pollak, J.