**Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

650 Page Mill Road
Palo Alto, CA 94304-1050
PHONE 650.493.9300
FAX 650.493.6811
www.wsgr.com

May 13, 2004

**VIA FED EX OVERNIGHT**

Hon. Louis H. Pollak
United States District Court
Eastern District of Pennsylvania
601 Market Street
16613 U.S. Courthouse
Philadelphia, PA  19106

Re:    *Amkor Technology, Inc. v. Alcatel Business Systems, et al.,*
       **Civil Action No. 02-3156**

Dear Judge Pollak:

Pursuant to the Court's Order dated April 26, 2004, and in response to defendants-respondents Alcatel Business Systems's ("ABS") and Assurances Generales De France IART's ("AGF") (together, the "Defendants") letter brief of May 3, 2004 (the "May 3 Letter"), plaintiff-petitioner Amkor Technology, Inc. submits this letter brief in connection with the current discovery dispute.

## I.    INTRODUCTION

After their motion to dismiss and subsequent motion for reconsideration were denied, ABS and AGF served Amkor with sixteen document demands and one notice of deposition (the "Discovery Requests").  Amkor objected to the Discovery Requests on the grounds that, *inter alia*, they sought documents and testimony that are not relevant to the only in this litigation, whether ABS and AGF must arbitrate their dispute with Amkor.[1]

In their May 3 Letter, Defendants argue that Amkor should be compelled to respond to the Discovery Requests.  According to Defendants, the requests are limited to the issue of whether Amkor provided a "custom made" chip to ABS.  *See* May 3 Letter at 1-2.  Since the Court denied the Defendants' motion to dismiss on the grounds that, *inter alia*, ABS received a "direct benefit" from Amkor in the form of custom made mobile telephone components (*i.e.*,

---

[1] Contrary to Defendants' allegations, Amkor has not asserted that ABS and AGF are entitled to *no* discovery in this case.  Because the current Discovery Requests seek documents and testimony that are not relevant to this litigation, however, Defendants are not entitled to the specific discovery they have requested.

C:\NrPortbl\PALIB1\CBW\2441690_3.DOC

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 2

semiconductors or "chips"), Defendants contend that the issue of whether ABS received a custom made chip from Amkor is relevant to the Court's determination of whether Defendants should be required to arbitrate their claims. *See id.* Defendants are wrong.

As discussed more fully below, the Discovery Requests go far beyond this narrow issue. Instead, the requests are directed to the merits of the Defendants' claims against Amkor (and, indeed, go even further, requesting documents concerning components that are not even at issue in the dispute). Because the court's role on a motion to compel arbitration is limited to determining whether the parties agreed to arbitrate their dispute and, if so, whether the agreement is valid, the merits of the Defendants' underlying claims are not relevant to this litigation. Accordingly, Amkor should not be required to respond to any of the Discovery Requests.[2]

Rather than seeking discovery relevant to the sole issue in this litigation, the requests appear to be another attempt to delay resolution of this simple case. Amkor filed its petition two years ago. Defendants' motion to dismiss was denied nine months ago. Conducting even a fraction of the discovery sought by Defendants would take many more months — all of this litigation dealing with a straightforward jurisdictional issue. Amkor submits that it is time for this matter to go to where it belongs, to an arbitration where the merits of the dispute can be addressed.

## II.    BACKGROUND

Although the Court is familiar with the facts of this case, we believe that a brief recitation of the history of this litigation will aid the Court in resolving the current discovery dispute:

On November 5, 1999, Amkor entered into an agreement with Alcatel Microelectronics N.V. ("AME") whereby Amkor agreed to perform manufacturing services for AME (the "Agreement"). Article 16 of the Agreement provides that any dispute arising under the Agreement shall be submitted to AAA arbitration in Philadelphia.

Under the terms of the Agreement, Amkor manufactured components for mobile telephones to AME's specifications. AME, in turn, supplied the components manufactured by

---

[2] In their May 3 Letter, Defendants assert that Amkor has agreed to produce documents in response to Document Demands Nos. 15 and 16. Defendants are mistaken. Amkor has not agreed to produce documents in response to these Demands. On the contrary, as set forth in Amkor's Objections and Responses to ABS and AGF Document Requests, Amkor will not produce the documents Defendants seek in Demands Nos. 15 and 16 because these documents are already in the possession of Defendants.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 3

Amkor to its sister company, ABS. In early 2001, a dispute arose between Amkor and AME involving the alleged failure of the components.

Notwithstanding the broad arbitration clause in the Agreement, ABS and AGF filed two actions in Paris, France against Amkor in connection with the parties' dispute over the alleged failure of the mobile telephone components. Shortly thereafter, Amkor filed a petition in this Court to compel ABS and AGF to arbitrate their claims against Amkor in Philadelphia. ABS and AGF moved to dismiss Amkor's petition on the grounds that, *inter alia*, they were not signatories to the Agreement and, thus, they were not required to arbitrate their claims in accordance with the Agreement. Defendants, however, did not dispute the existence of the Agreement or challenge the validity of the arbitration provision.

On August 22, 2003, the Court denied the Defendants' motion to dismiss, holding that ABS and AGF (as ABS's insurer) are bound by the Agreement and the arbitration clause under a theory of equitable estoppel. *See* August 22, 2003 Opinion ("August 22 Order") at 11. Specifically, the Court found that ABS received a "direct benefit" from Amkor in the form of custom made mobile telephone components. *See id.* at 6-8. The Court's decision was based primarily on the testimony of three ABS employees and the Second Circuit's decision in *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999).

On January 21, 2004, ABS and AGF served Amkor with the Discovery Requests.

**III.    ARGUMENT**

On a motion to compel arbitration, "[t]he district court decides only whether there was an agreement to arbitrate, and if so, whether the agreement is valid." *Great Western Mortgage Corp. v. Peacock*, 110 F.3d 222, 228 (3rd Cir. 1997). The district court's role "is strictly limited to determining arbitrability and enforcing agreements to arbitrate." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000), *quoting Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 477-78 (9th Cir. 1991). Consequently, the merits of the parties' underlying claims and defenses are not relevant to the court's determination of whether the parties are required to arbitrate their dispute. *See Great Western* at 229 (on a motion to compel arbitration, "the merits of the controversy are left for the disposition of the arbitrator"). In doing so, the court may order discovery only to "provide evidence relevant to the existence of an arbitration agreement when deciding whether to compel arbitration. The [Federal] Rules do not, however, apply to the actual proceedings on the merits before the arbitrators . . ." *Moore's Federal Practice* § 81.08[1] (2001).

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 4

For the reasons discussed more fully below, the Discovery Requests being pursued by ABS and AGF go far beyond the issue of whether ABS and AGF are required to arbitrate their claims. Indeed, the requests go directly to the merits of the dispute. Because the merits are not relevant to the issue of whether ABS and AGF must arbitrate their dispute with Amkor (*see Great Western*, 110 F.3d at 229), the Discovery Requests seek documents and testimony that are not relevant to this litigation. Accordingly, the Court should not compel Amkor to respond to any of the Discovery Requests.

**A.     The Court Should Not Compel Amkor To Respond To Document Demands Nos. 1 And 6.**

Demands Nos. 1 and 6 seek documents reflecting Amkor's communications with AME concerning the "design, manufacturing, testing, and . . . subsequent sale" of the mobile telephone components. May 3 Letter at 2. Defendants assert that such documents are relevant to Amkor's claim that ABS was involved in the design and testing of the "custom made" components. *Id.*

Notwithstanding Defendants' contentions, documents reflecting Amkor's communications with AME are not relevant to the question of ABS's involvement in the design and testing of the mobile telephone components. Amkor has never relied on any communications between Amkor and AME to support its argument that ABS participated in the "design, manufacturing, testing, and . . . subsequent sale" of the components. Instead, Amkor's position was (and is) based entirely on the testimony of ABS employees. *See* Amkor Technology, Inc.'s Supplemental Memorandum Regarding Jurisdiction (the "Opposition") at 2-3.[3] Thus, while the documents Defendants seek in Demands Nos. 1 and 6 may be relevant to the

---

[3] For example, as explained at length by Dominique Castel, the head of ABS's semiconductor design team and the person responsible for ABS's design efforts with respect to the chips that are the subject of the dispute, ABS jointly designed the semiconductors with AME. *See* Castel Tr. 14-27; *see also* August 22 Order (recognizing that "ABS jointly designed the semiconductors at issue with AME"). ABS designed what was called the "front end database" of the semiconductor. AME, in turn, designed the "back end database." Castel. Tr. 22-23. The two design teams then held a meeting to review the design and ABS reviewed and approved the final design of the semiconductors before the design was sent to Amkor. Castel Tr. 25-27. The design was approved, so AME was then authorized to send the design to be manufactured. *Id.* After the jointly-produced design was manufactured into prototypes, ABS tested prototypes to see if they worked and met specifications. Castel Tr. 38-39; Herve Karabadjakian Tr. 13-14. (Mr. Karabadjakian was an ABS quality control engineer.) The cited pages of testimony are attached.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 5

merits of this dispute, they are not relevant to ABS's admission that was intimately involved in the creation of the chips at issue. Accordingly, Amkor should not be compelled to respond to these Demands.

**B.    The Court Should Not Compel Amkor To Respond To Document Demands Nos. 9, 10 And 11.**

Demands Nos. 9 and 10 seek documents concerning Amkor's sales or offers to sell the relevant mobile telephone components or similar components to third parties other than AME, ABS, and AGF. *See* May 3 Letter at 2-3. Demand No. 11 seeks documents regarding the design, creation, and/or fabrication of the components that are at issue. *See id.* at 3.

Defendants claim that Amkor has asserted that it provided "custom made" mobile telephone components to AME and argue that they are entitled to any documents concerning the design and sale of similar components to third parties. Defendants contend that these documents will confirm or refute Amkor's allegations that ABS jointly designed the relevant components.

Again, however, the documents that Defendants seek are not relevant to this litigation. Defendants have conveniently overlooked the fact that the sole basis for Amkor's assertion that it provided "custom made" components to ABS is the testimony Amkor obtained from ABS's own employees. *See* Opposition at 2-3. Consequently, the documents that Defendants seek in Demands Nos. 9, 10 and 11 will not confirm or refute Amkor's claim that it provided "custom made" components to ABS. Amkor should not be compelled to respond to these Demands.

In addition, that Demands 9 and 10 seek documents concerning components that would not even be at issue in this case demonstrates that Defendant's requests are far from narrowly tailored.

**C.    The Court Should Not Compel Amkor to Respond To Document Demands Nos. 4 And 5.**

Demands Nos. 4 and 5 seek drafts of the Agreement and any documents reflecting "the proposal, negotiation, approval, acceptance, and execution" of the Agreement. May 3 Letter at 3. Defendants claim they are entitled to review these documents because Amkor "has focused its entire case upon [the Agreement]." *Id.*

The documents sought in Demands Nos. 4 and 5 are not relevant to this litigation. As a threshold matter, the Agreement contains an integration clause. *See* Agreement at Section 17.3.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 6

Because this Court has already determined that the Agreement is clear on its face (*see* August 22 Order at 8 n.3), there is no need for parol evidence and/or previous drafts of the Agreement.

Further, ABS and AGF have never contested the validity of the Agreement or the arbitration provision. Instead, ABS and AGF have merely taken the position that they are not required to arbitrate their claims because (i) ABS did not have a close business relationship with AME and (ii) ABS did not "embrace" the Agreement or receive a "direct benefit" from Amkor. The documents that Defendants seek in Demands Nos. 4 and 5 are not relevant to any of these issues.

**D.    The Court Should Not Compel Amkor to Respond To Document Demands Nos. 2, 3, 8, 12 And 13.**

Demands Nos. 2, 3, and 8 seek documents concerning communications between Amkor, ABS, and AGF regarding the mobile telephone components that Amkor manufactured for AME. *See* May 3 Letter at 3. Demands Nos. 12 and 13 seek documents reflecting communications between the parties regarding the alleged "failure" of the components. *See id.* at 4.

According to Defendants, these communications "are critical to any 'direct benefit' analysis" and are, therefore, relevant to this litigation. *Id.* at 3. However, this Court has already rejected the Defendants' position. In the August 22 Order, the Court explained:

> Even if one assumes *arguendo* that ABS did not inject itself into the communications between Amkor and AME, the *Tencara* case shows that, so long as a non-signatory has received a direct benefit from a contract, it is not essential that the non-signatory be shown to have interacted regularly with the signatory that seeks to enforce the arbitration clause . . . Therefore, ABS's insistence that it had insubstantial direct contact with Amkor carries little force in suggesting a result different from that reached in *Tencara.*

*See* August 22 Order at 7. Because the Court has already recognized that any communications (or lack thereof) between the parties are not relevant (much less "critical") to the "direct benefit" analysis, Amkor should not be compelled to produce documents in response to these Demands.

**E.    The Court Should Not Compel Amkor to Respond To Document Demand No. 7.**

Demand No. 7 seeks documents "concerning the sale of other goods and/or services from Amkor to AME." May 3 Letter at 3. Defendants claim that these documents "will establish the

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 7

course of dealing between the parties" and "directly disprove" the Company's allegation that "AME functioned merely as a purchasing agent for ABS in [AME's] transactions with Amkor." *Id.* However, documents reflecting the course of dealing between the parties in *other* transactions will not have any bearing on the course of dealing between the parties in *this* specific transaction. Moreover, documents reflecting AME's role in other transactions with Amkor (if any) are not relevant to AME's role in this specific transaction. Finally, as the Court recognized in the August 22 Order, the question of whether ABS and AGF should be compelled to arbitrate will be determined by (i) ABS's participation in the design and testing of the mobile telephone components at issue; and (ii) the relationship between ABS and AME. *See* August 22 Order at 6-9. Thus, documents concerning other transactions between Amkor and AME are not relevant. Amkor should not be compelled to respond to this Demand.

F.    **The Court Should Not Compel Amkor To Provide Testimony In Response To Defendants' Deposition Notice.**

Apart from the document requests, Defendants served a deposition notice pursuant to Rule 30(b)(6) listing nineteen (19) categories. Defendants fail to explain in the May 3 Letter why Amkor should be compelled to provide testimony on the topics set forth in the deposition notice. The topics listed in the deposition notice are almost identical to the categories of documents that Defendants have requested in their document demands. *Compare, e.g.,* Notice of Discovery and Inspection, Demands Nos. 4, 11, and 13 *with* Notice of Deposition, Topic Nos. 1-2, and 11. Thus, for the reasons discussed above, the Court should not order Amkor to provide testimony in response to the deposition notice.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court should not require Amkor to provide any documents or testimony in response to the Discovery Requests.

We thank the Court for its time and consideration.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Ignacio E. Salceda

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Hon. Louis H. Pollak
May 13, 2004
Page 8


cc.    Patrick Loftus, Esq.
       Thomas A. Leghorn, Esq.
       Wendy Testa, Esq.

1

2              UNITED STATES DISTRICT COURT

3            EASTERN DISTRICT OF PENNSYLVANIA

4                      ---oOo---

5    In re AMKOR TECHNOLOGY, INC.,
     a Delaware Corporation,

6    Plaintiff/Petitioner,

7    v.

8    ALCATEL BUSINESS SYSTEMS,
     a French Corporation,

9    ASSURANCES GENERALES DE FRANCE LART,
     a French Corporation,

10   and ALCATEL MICROELECTRONICS N.V.,
     a Belgian Corporation.

11

12   Defendants/Respondents

13

14

15              DEPOSITION OF DOMINÏQUE CASTEL
                 WEDNESDAY, JUNE 25, 2003

16

17

18

19

20

21

22

23

24

25

14

1    A        Yes, it had.

2    Q        What about like ISO 9001?

3    A        I think it was ISO 9001.

4    Q        Now Alcatel Mobile Phones was your

5    employer, right?

6    A        Yes.

7    Q        Have you ever heard of a company

8    called Alcatel Microelectronics?

9    A        Yes.

10   Q        What is your understanding of

11   Alcatel Microelectronics?

12   A        Alcatel Microelectronics is a

13   supplier of semi conductors and manufacturing

14   also.  They had a factory.

15   Q        During the period 1998 to 2000, did

16   Alcatel Microelectronics supply components to

17   Alcatel Mobile Phones?

18   A        Yes, it would supply components.

19   Q        It would supply components?

20   A        Yes.

21   Q        Do you know what kind of

22   components?

23   A        They were the second source for

24   analog chips and also for digital chips.

25   Q        Forgive me?

1    MR LEGHORN:   A second source.

2    A      A second source.  They were not able

3  to produce digital chips, so the chips were

4  produced in Taiwan or in foundries, you know,

5  because we did not have the factory to produce

6  digital chips.

7    Q      So for Alcatel Mobile Phones, AME

8  produced only the analog chips?

9    A      Yes.

10    Q      Do you remember who produced any

11  digital chips for Alcatel Mobile Phones?

12    A      Yes, there was UMC in Taiwan.

13    Q      You said UMC?

14    A      Yes.

15    Q      And is it TSMC?

16    A      Yes, TSMC in Taiwan, yes.

17    Q      In connection with the chips made

18  for Alcatel Mobile Phones for UMC, was AME involved

19  in that in any way?

20    A      They were in charge of the

21  engineering, in fact.  So because we developed

22  apparatus for the first source that was

23  Microelectronics, and then there was a need to

24  adapt the apparatus for the foundry, for example

25  for UMC, and so AME was in charge of the

1  adaptation, and then they were in charge of when
2  (<u>inaudible</u>) were produced, they were in charge of
3  characterizing the chips, to change the
4  performance, temperature and so on.  They were in
5  charge of testing the chips.  They were in charge
6  of packaging.  They had to find a subcontractor for
7  packaging.  Then they tested the chips, and they
8  shipped the packaged chips to Alcatel Mobile
9  Phones; the factory.
10         Q        What about the chips made by TSMC?
11         A        It was the same, yes.
12         Q        So, in general, your groups designed
13  the chips, and the engineering and testing was done
14  by AME?
15         A        Yes, that is right.
16         Q        And if it was an analog chip, AME
17  made it?
18         A        Yes, they were able to produce it.
19         Q        But in the chips that your team
20  designed for digital phones, AME would do the
21  engineering?
22         A        Engineering, yes.
23         Q        But they could not manufacture it?
24         A        No, they could not manufacture it.
25         Q        But they would be doing engineering

1    and they would also be doing testing on the digital

2    chips?

3                A        Yes.

4                Q        So that is correct?

5                A        That's correct, yes.

6                Q        Were there any analog chips designed

7    by your groups in 1998 which were not engineered by

8    AME?

9                A        The first source was ST

10   Microelectronics, so the production came first from

11   them.

12               Q        What do you mean by first source?

13   Do you mean the company who actually manufactured

14   the chips?

15               A        ST was manufacturing the chips.

16   They were not subcontracting to foundries.  But

17   first source, it means the first supplier, the

18   first to deliver to Alcatel Mobile Phones.

19               Q        For the chips made by ST

20   Microelectronics for Alcatel Mobile Phones, was AME

21   involved in the engineering and testing of those?

22               A        No.

23               Q        It was just ST Microelectronics and

24   Alcatel Mobile Phones?

25               A        Yes, that is right.

1       Q       For digital chips, the ones made by
2  UMC and TSMC, in both instances AME was involved in
3  the engineering and testing?
4       A       Yes, they were involved.
5       Q       Were there ever any digital chips
6  designed by your teams during 1998 to 2000 where
7  AME was not involved in the engineering or
8  testing?
9       A       The chips, for the first source it
10 was totally processed in ST, the interface was with
11 ST, and it was second source, for the same design
12 you can say, when it was second sourced it was
13 managed by AME that made engineering, testing.
14      Q       Did ST Microelectronics produce any
15 digital chips for Alcatel Mobile Phones?
16      A       Yes, they produced.
17      Q       So whenever you needed a second
18 source was AME always involved with the second
19 source?
20      A       Yes.
21      Q       Are you familiar with a
22 semiconductor that goes by the name BBGX?
23      A       Yes.
24      Q       What is your understanding of that?
25      A       The name in mobile phones was

1   BBGTV3A2, but in AME there was a limitation to four

2   characters for the system, card system, so they

3   name it BBGX.

4          Q       Was it also known at various points

5   as BBGS?

6          A       No.  BBGS, it was another variation

7   of the chip.  It was a previous version.  It was

8   the name of BBGTV3A1, for example.

9          Q       So BBGTV3A1 was also known as BBGS?

10          A       Yes, it was BBGS plus a number,

11   because there were several numbers.

12          Q       Then version 3A2 was BBGX?

13          A       Yes.

14          Q       Did the design teams that reported

15   to you design both BBGS and BBGX?

16          A       Yes.

17          Q       Regarding BBGS, was that a digital

18   chip?

19          A       Yes, it was.

20          Q       Was BBGS manufactured by ST

21   Microelectronics?

22          A       Yes.

23          Q       Was BBGS manufactured by any other

24   company for Alcatel Mobile Phones?

25          A       It was also produced in the second

1    source, so in UMC, TSMC and other control of AME,
2    yes.
3                Q        So BBGS was produced by UMC and
4    TSMC?
5                A        It has to be confirmed because I
6    don't remember all the sources at the time.   I
7    don't know but I think it was the main choice of
8    AME, yes, because there have been many variations,
9    so I cannot remember all the producers of all the
10   chips.
11               Q        Do you know if BBGS was ever
12   manufactured by Amkor?
13               A        I don't know.   I don't know.
14               Q        As for BBGX, was that manufactured
15   by ST Microelectronics?
16               A        Yes, it was.
17               Q        Was it manufactured by any other
18   companies, to your knowledge?
19               A        Then it was manufactured by another
20   controller of AMC; by AME, by UMC, AMSC and Amkor.
21               Q        What do you mean by under the
22   control of AME?
23               A        They were in charge of engineering,
24   testing and they had the relations with, from the
25   technical point of view, they had the interface

1    with the foundries.  We had no contact, from a

2    technical point of view, we had no contact with

3    TSMC, AMSC and Amkor.

4              Q       So your contract with regard to BBGX

5    was solely with AME?

6              A       ST and AME.

7              Q       So regarding the secondary sourcing,

8    it was solely with AME?

9              A       Yes.

10             Q       Could you describe the process by

11   which the BBGX chip was designed and then

12   engineered and ultimately manufactured?  I realize

13   that it is a long process, but could you give me

14   your understanding of that process?

15             A       Yes.  The design in Alcatel Mobile

16   Phone was done from ST library.  It was a standard

17   cell chip, so there was a library with a flip-flop,

18   RAM memories, PL bars and so on.

19             Q       I think you are going to have to

20   slow down, particularly on the technical terms.

21             A       Okay.  So we received a library from

22   ST.

23             Q       What is a library?

24             A       Library is a set of cells, like a

25   flip-flop, NOR gates, NOT gates, NOR memories, RAM

1    memories, PL bars and so on; many cells to build a

2    chip.  Then in the design we make the assembly of

3    the chip by using those cells, and we do it by

4    digital synthesis.  So we write the modules, we

5    describe the chip in VHDL language, and then we

6    synthesize the chip by calling the ST library, and

7    so it makes a database, a front end data base.  So

8    then we have to simulate the chip, to be sure that

9    it is consistent with our specifications.

10           Q       By simulation, is that electronic

11    simulation?

12           A       Electronic simulation, yes.  So on

13    the work stations we have wafer forms, for example,

14    and we input some clogs and some data, and then we

15    check by the simulations that it is okay.  We have

16    also some reference of a simulation, because it is

17    not only visual verification, we can output the

18    result of simulation and compare with the

19    reference.  Then when it is okay we have the front

20    end data base.

21           Q       At what point did Alcatel Mobile

22    Phones contact AME regarding BBGX?

23           A       So we have a front end data base

24    that we have validated by simulation.  Then the

25    back end is done in AME that has an antenna in

1    Colombes, also that had an antenna in Colombes,

2    near Alcatel Mobile Phones, and they are in charge

3    of making the back end data base, the layout,

4    because we were not equipped with layout tools, so

5    they make the layout.

6          Q        The layout of the chip or the layout

7    of the rest of the phone?

8          A        The layout of the chip, because at

9    our level in Alcatel Mobile Phones it is just like

10   a flip-flop relating to another flip-flop; just a

11   list of names.  Flip-flop A connected to flip-flop

12   B, for example.  It is not physical.  It cannot be

13   produced by a manufacturer.

14               MR LEGHORN: It is schematic.

15         A        It can be schematic or on that list

16   of components.  Then we have to move to the back

17   end to produce a layout, and this is done in AME

18   Colombes, and then there is a database that can be

19   transferred to the foundry, UMC, TSMC.

20         Q        Did Alcatel Mobile Phones contact

21   any company other than AME to work on the back

22   end?

23         A        It was done in the past.  It has

24   been done for some design.  It was done before 1994

25   we were working with Alcatel Bel, in Belgium, and

1  they were doing the layout for us, and from 1994 it
2  was done in AME.
3        Q       So since 1994 the back end was
4  designed by AME?
5        A       Yes.
6        Q       And before 1994 it was done by
7  Alcatel Belgium?
8        A       Yes.  It was Alcatel Bel, Antwerp.
9        Q       Alcatel Bel?
10       A       Yes.
11       Q       Forgive me.  So AME began doing the
12  back end design in 1994?
13       A       Yes.
14       Q       Between 1994 and 2000, did Alcatel
15  Mobile Phones have any company other than AME
16  design the back end?
17       A       No.
18       Q       Who was the person responsible for
19  deciding who was going to manufacture the BBGX
20  chip?
21       A       It was purchasing department in
22  fact.
23       Q       Your purchasing, the Alcatel Mobile
24  Phone purchasing?
25       A       Yes, the Alcatel Mobile Phone

1  purchasing.

2         Q       When your team designed the front

3  end, would it then contact people at AME to work

4  with them on the back end?

5         A       Yes, there was a technical contact.

6  There was a designer issue to transfer the back

7  list, and then there was a (inaudible word) and

8  then there was a feedback from AME because there

9  was the capastans (?) for the interconnections that

10  were reused in the front end simulation.

11        Q       So in designing BBGX, AME, in

12  working on the back end, would then interface with

13  Alcatel Mobile Phones so that the front end and the

14  back end would work together?

15        A       Yes.

16        Q       What was the process after the front

17  end and the back end worked together, between then

18  and ultimately the manufacture of the chip?

19        A       Then there was a step that was named

20  tapeout.  So that is a transfer of the tape to the

21  foundry, to the manufacturer.  It could be done

22  also by the network, ISB network, but the name of

23  the step is named tapeout.  And then a manufacturer

24  could check the tape, could check that it was

25  compliant with all the rules of the manufacturer,

1   and then they produce the masks, a set of masks,

2   and then they produce the wafers and so on.

3           Q       So the tapeout, the transmission of

4   the tapeout to the manufacturer, who did that?

5           A       It was AME.  We had a final design

6   review with AME to check that all the necessary

7   verifications had been performed, and then the

8   tapeout was done by AME.

9           Q       So the final design verification was

10  done before tapeout?

11          A       Yes.

12          Q       Did you take part in that final --

13          A       No, I took part in the final design

14  review.

15          Q       You took part personally in the

16  final design review?

17          A       Yes.

18          Q       Was this a meeting?

19          A       Yes, it was a meeting.

20          Q       Do you remember who attended the

21  meeting?

22                  MR LEGHORN:   You are talking about

23  a meeting, but all along we have been talking about

24  chips in general.

25                  MR SALCEDA:   I am talking

1    specifically about the BBGX chip.  Do you remember

2    taking part in a final verification meeting, or how

3    would you describe that, or a set of meetings?

4         A      It was done with people from AME

5    Colombes, so there was one or two people from AME

6    Colombes and one or two people from Alcatel Mobile

7    Phones, yes.

8         Q      Was that meeting necessary in order

9    for the approval of the design of the chip before

10   it went to tapeout?

11        A      Yes, it was necessary.

12        Q      Do you recall any discussion at that

13   point as to who would be manufacturing BBGX?

14        A      No, I was not informed of the final

15   manufacturer.

16        Q      Do you remember when this meeting

17   took place?

18        A      I think it must be at the end of

19   1999.

20        Q      Do you remember if by the time of

21   this meeting a manufacturer had been selected?

22        A      No, I don't remember.

23        Q      Did you learn at some point who was

24   the manufacturer of BBGX?

25        A      I learned it but I was no more

1   they informed the purchasing.

2                    MR LEGHORN:    He wants to know if

3   you know.

4         A          Personally I don't know, in fact.

5                    MR SALCEDA:    You don't know.  Let's

6   take the BBGX chip aside.  For earlier chips, were

7   you informed that AME had sent the tapeout to the

8   foundry?

9         A          I was informed that samples would

10  come back from UMC, for example on week 29.  They

11  informed us there would be samples back from the

12  foundry; prototypes back from the foundry.

13        Q          Would the prototypes be tested?

14        A          They were tested in Alcatel Mobile

15  Phones.

16        Q          Alcatel Mobile Phones tested

17  prototypes?

18        A          They tested prototypes on a test

19  bench.

20        Q          Did Alcatel Mobile Phones test the

21  prototypes of every chip it was going to purchase?

22        A          Yes.  They test the prototypes, not

23  tests of production, of course.

24        Q          We are talking about prototypes.

25  Did Alcatel Mobile Phones test any production chips

1    after they went into production?

2          A      No.

3          Q      Do you know if AME tested production

4    chips?

5          A      I don't know.

6          Q      Do you know if production chips were

7    tested at all?

8          A      If I remember well, the production

9    was tested, the production was subcontracted and

10   the test was also subcontracted.

11         Q      Subcontracted by AME to a third

12   party?

13         A      To a third party, yes.  I do not

14   know exactly.  It is more purchasing follow that

15   kind of question.

16         Q      The testing of prototypes was done

17   by Alcatel Mobile Phones?

18         A      It was a functional test, yes, by

19   Alcatel Mobile Phones.

20         Q      Did Alcatel Mobile Phones do that

21   itself or contract it to another company?

22         A      No, it was done by Alcatel Mobile

23   Phones.

24         Q      When you changed jobs in March 2000,

25   who became the head of ASIC design?

1    seen any of those pages before?

2         A       No.

3         Q       Have you ever seen the technical
4    specifications for the 3A2?

5         A       I have never seen the
6    specifications, no.

7         Q       Do you know if there is a written
8    document which has the technical specifications for
9    the 3A2?

10        A       Yes.

11        Q       Do you know if those specifications
12   were created by ABS or by AME?

13        A       ABS did produce a specifications
14   document for the 3A2.

15        Q       Have you ever seen any reports of
16   any testing of the 3A2?

17        A       What test reports are you referring
18   to?

19        Q       Well, is there more than one type of
20   test report?

21        A       There are several different types of
22   testing.  There may be reliability tests, unit
23   testing, parametric testing.

24        Q       Are you aware of who did which
25   tests.  I mean, what company, ABS or AME?

1          A        Component testing was done by AME.
2          Q        Do you know if ABS tested any
3    prototypes?
4          A        Yes, ABS tests prototypes.
5          Q        Did ABS test prototypes of the 3A2?
6          A        Yes.
7          Q        Have you ever had any contact with
8    anyone who worked for Amkor Technology?
9          A        Yes.
10         Q        Can you summarize those contacts and
11   who they were with?
12         A        I met members of Amkor Technology on
13   the occasion of the audit that was done in Seoule,
14   in March 2001, and from memory the names I have
15   available I could provide would be Thierry Venet.
16         Q        Is Thierry Venet someone from Amkor?
17         A        Yes.
18         Q        Did you personally go to Korea?
19         A        Yes.
20         Q        Who decided that you would go to
21   Korea?
22         A        Visiting suppliers and maintaining
23   contact with the suppliers is part of my
24   responsibility.  That is my job.  It was decided by
25   my management, together with purchasing, that the